[Civ. No. 1095.   Third Appellate District.—April 2, 1914.]

J. E. KING, Respondent, v. IRA HILL REED, Appellant.

BROKER—COMPENSATION FROM BOTH PARTIES—WHETHER PERMISSIBLE. The rule that a real estate broker may not receive compensation from both parties applies only in cases where he is clothed with some discretion in the matter of advising or negotiating the sale or purchase of the property.

ID.—MIDDLEMAN—WHO IS AND RIGHT TO COMPENSATION FROM BOTH PARTIES.—One who simply brings a buyer and seller together, so that they are thereby enabled to make their own contract, is a "middleman." He does not occupy a fiduciary relation, he does not represent conflicting interests, and therefore he is not precluded from receiving compensation from both parties to the sale.

ID.—SALE OF MINE—BROKER AS MIDDLEMAN—COMPENSATION FROM BOTH PARTIES.—Where the services of a broker in relation to the sale of a mine consist simply in directing purchasers to the property, and in bringing the buyer and seller together whereby a sale results through their own negotiations, the fact that the broker receives compensation from the buyer does not relieve the seller from his obligation to pay commissions.

APPEAL from a judgment of the Superior Court of Calaveras County and from an order refusing a new trial.  F. V. Wood, Judge presiding.

The facts are stated in the opinion of the court.

Snyder & Snyder, Ira Hill Reed, and L. Horwitz, for Appellant.

Frank R. Wehe, and John Hancock, for Respondent.

BURNETT, J.—In this cause a rehearing was granted by this court for the purpose of giving further consideration to the question whether the plaintiff acted as an agent for both parties or only as a mere middleman in the transaction involving the sale of the mine referred to in the complaint.  A general view of the case may be presented by the following quotation from the opinion filed herein, September 29, 1913.

"This is an action to recover the sum of $1,950.00, alleged to be due the plaintiff from the defendant for services in negotiating and consummating for the latter a sale of a gravel placer mine.

"The complaint alleges that, on the 29th day of April, 1907, the defendant entered into a written contract with the plaintiff whereby the first named promised to pay the plaintiff ten per cent of the selling price of the gravel placer mine known as 'Reed Drift Mine' in the event that plaintiff should sell said mine in accordance with the terms of a bond or agreement for the sale of the same, entered into by and between the plaintiff and the defendant on the 29th day of April, 1907; that the plaintiff thereafter, in pursuance of the terms of said agreement, succeeded in effecting a sale of said mine to J. J. Hickey and Charley Lamb for the sum of thirty-six thousand dollars, 'out of which amount, and under and in pursuance to the terms of said commission agreement, dated April 29, 1907, between the plaintiff and the defendant herein, there was due to plaintiff the sum of thirty-six hundred dollars, being the said ten per cent of said selling price.'  It is alleged that the defendant paid to the plaintiff, on account of the compensation due him under said commission agreement for so effecting the sale of said mine, the sum of

$1,650.00, but no more than said sum, and that there is, therefore, a balance due the plaintiff on the commission which the defendant agreed to pay him for the services referred to the sum of $1,950.00, for which, together with interest thereon from the date that the same became due, judgment is prayed.

"The theory of the defense, as disclosed by the answer, is that the plaintiff, having accepted employment from both the vendor and the vendees to negotiate for the one the sale and the others the purchase of the property involved, cannot recover upon the pleaded contract for reasons which will hereafter be made to appear.

"The answer declares that the plaintiff, in the negotiations with the defendant for the purchase of the mine, in pursuance of the terms of his employment by Hickey and Lamb, induced the defendant to execute, on the 21st day of April, 1907, writings in the words and figures following, to wit:

" 'It is hereby understood that if on or before next Friday, April 26th, 1907, Joseph E. King with a Mr. Lamb will visit the Reed Mine that I agree to sell the latter the said property at the agreed purchase price of thirty-six thousand dollars and this offer to sell is to hold good for ten days after said Lamb appears on the ground.

Apr. 21st, 1907.

(Signed) IRA HILL REED.'

" 'In the event of a sale of the Reed mine to a Mr. Lamb under an agreement of even date given to Joseph E. King fixing the purchase price at thirty-six thousand dollars it is understood that said King is entitled to a commission of ten per cent pro rata on payments of said purchase price as made. April 21, 1907.

(Signed) IRA HILL REED.'

"Said negotiations, proceeds the answer, resulted, on or about the 29th day of April, 1907, 'in the execution by the defendant of a contract and agreement for the sale of said premises by the defendant to the said Hickey and Lamb, the said contract having been made on behalf of said Hickey and Lamb in the name of plaintiff, J. E. King. That the purchase price of said premises provided in said contract and agreement was the sum of thirty-six thousand dollars; that, on said 29th day of April, 1907, the plaintiff procured the defendant

to make a further writing which was and is in the words and figures following, to-wit:

" 'It is understood and agreed that in the event of a sale of the Reed mine under a bond made this day to Joseph E. King at the stated price of thirty-six thousand dollars or at any other sum he is entitled to a commission of ten per cent pro rata on payments as made.
April 29th, 1907.

(Signed)   IRA HILL REED.' "

"The answer then avers that, during all said negotiations, the defendant believed that the plaintiff was acting solely for him, and was wholly ignorant of the fact that the plaintiff was acting for Hickey and Lamb therein; that the plaintiff never at any time disclosed to the defendant that he was representing Hickey and Lamb as their agent in said negotiations, but led the defendant to believe that he was acting therein for him alone; that the writings executed by the defendant and quoted above were executed by him with the understanding and belief that the plaintiff was solely representing him (defendant) in said transaction; 'that defendant would not have executed said writings aforesaid if he had known or had notice before the execution thereof that the plaintiff was so acting as the agent and representative of said Hickey and Lamb.'

"It is alleged that Hickey and Lamb entered into a contract with the plaintiff whereby they agreed to pay him for effecting the purchase of said mine the sum of $1,800.00, and that plaintiff has been paid said amount by Hickey and Lamb. The payment of $1,650.00 by the defendant to the plaintiff, on account of the contract entered into by them, was made, so the answer alleges, before the defendant was made aware of the fact that the plaintiff conducted the negotiations referred to solely as the agent of Hickey and Lamb.

"The defendant sets up a counterclaim against the plaintiff based upon the money received by the latter from the defendant under the circumstances above set forth.

"The court found all the material allegations of the complaint to be true, and, as to the defense set up in the answer, found that 'it is not a fact, as alleged in paragraph 3, that plaintiff negotiated for the purchase of the mining claim or procured the defendant to execute the writings therein mentioned in pursuance only of his employment by Hickey and

Lamb or solely as the agent or representative of said Hickey and Lamb.' The court further found that the plaintiff informed the defendant that Hickey and Lamb were to pay the plaintiff a compensation, either in money or an interest in the mine concerned here, to be thereafter fixed by them (Hickey and Lamb) for the services of the plaintiff in negotiating the purchase of said mine; that, upon April 29, 1907 (the date of the last commission agreement between the plaintiff and the defendant), and at all the times he paid the plaintiff said commission aggregating $1,650.00, and at all times subsequent to the 29th day of April, 1907, 'the defendant understood and well knew that in the negotiations for the purchase and sale of said mine plaintiff was acting both as the agent of Hickey and Lamb and of defendant, and plaintiff never represented to defendant that he was acting in any other capacity.' ''

The judgment was in favor of plaintiff in the sum sued for, and the defendant has appealed therefrom and from an order denying his motion for a new trial.

In passing to the consideration of the question set forth at the outset, it may be incidentally stated that the evidence is sufficient to support the finding of the court that defendant was notified by plaintiff as to the employment by said Hickey and Lamb. The controlling question is the one suggested, however, that is—Can we uphold plaintiff's theory that he was a middleman, that he simply brought the parties together and that they made the bargain and consummated the sale and purchase without the exercise of any discretion on the part of plaintiff?

In such case it is not disputed, as stated in the former opinion herein, that if "either party or both desire and agree to compensate him for his trouble in bringing them together upon a proposition, with either the making or the carrying out of which he has had nothing to do, there can be no legal or moral objection to the enforcement of such agreement."

The principle applicable to such capacity and which distinguishes it from the fiduciary relation of agency has been announced and illustrated in numerous decisions of the courts.

In *Clark* v. *Allen*, 125 Cal. 278, [57 Pac. 985], it is said: "If the duty of the broker is simply to bring together two men who desire to exchange their lands and the broker's entire duty is performed when he has brought the two men together,

then we see nothing against good morals and a sound public policy in allowing compensation to the broker from each of the parties. In such a case the broker is in no sense representing conflicting interests; he has nothing whatever to do with the trade. Under the contract his advice and assistance to either party is not called for. Upon the state of facts here assumed, the broker may be termed a middleman and not an agent in the strict sense of the term.''

In discussing the legal and moral principle involved in the dual employment which is condemned by the law, it was said, by Judge De Haven, in *McLure* v. *Luke,* 154 Fed. 650, [24 L. R. A. (N. S.) 659, 84 C. C. A. 4], that: ''It will be found upon examination that this principle of law is only applied in cases where the agent is clothed with some discretion in the matter of advising or negotiating the sale or purchase of property, when the duty which he owes to one principal is inconsistent with that which he owes to the other.'' Among the cases cited therein is *Knauss* v. *Krueger Brewing Co.,* 142 N. Y. 70, [36 N. E. 867], in which the opinion was written by Judge Peckham, afterward associate justice of the United States supreme court. The property involved was a brewery, which was sold for one million, eight hundred and twenty-two thousand dollars. The plaintiff was employed to bring the possible buyer and seller together and in case of sale he was to be compensated by defendant. The plaintiff testified that he was to have nothing to do with fixing the price or terms of sale, that being left to the principals. The defense was that plaintiff, without the knowledge of defendant, was in the employment of the proposed purchaser. The court, in its opinion, said: ''The whole matter depends upon the character of his employment. If A is employed by B to find him a purchaser for his house upon terms and conditions to be determined by B when he meets the purchaser, I can see nothing improper or inconsistent with any duty which he owes B, for A to accept an employment from C to find one who will sell his house to C upon terms which they may agree upon when they meet; and there is no violation of duty in such case in agreeing for commissions from each party upon a bargain being struck, or in failing to notify each party of his employment by the other.''

The term "middleman" is defined by the supreme court of South Dakota, in *Langford* v. *Issenhuth,* 28 S. D. 451, [134 N. W. 889], as follows: "A middleman is a broker whose duties are limited by his contract to finding and procuring a purchaser able, willing and ready to accept his client's terms or to effect a transaction with his client in any terms satisfactory to both, the term 'middleman' being merely descriptive of the nature of the contract of employment, he being in no fiduciary relation to his principal nor under any obligation not to receive compensation from the opposite party to the transaction, while a broker, in addition to the duties of a 'middleman,' is employed to use discretionary authority for the benefit of his employer and to act for his best interests, and therefore may not accept a secret double employment or commissions from both parties."

The whole subject is exhaustively reviewed in the note to *Leathers* v. *Canfield,* as reported in 45 L. R. A. 33, to which we refer, contenting ourselves with this quotation to which is appended by the author a long list of authorities: "Where there is an agreement to pay a middleman for services of value rendered, honestly entered into, it cannot be avoided on the ground that another person with distinct and independent interest has agreed by a separate contract to pay for the same services, and if the broker only undertakes to bring the parties together so that they may make a trade if they choose without his interference in the contract itself as the agent of either party he is entitled to compensation from both on an arrangement from each."

The record before us, scrutinized with a view of finding support for the conclusion of the trial court, brings the case clearly within the purview of the foregoing declared characteristics of a "middleman." We are justified in asserting that plaintiff had for a long time been authorized to sell the property for defendant, the original price being for sixty thousand dollars and then being reduced to forty thousand dollars, defendant having executed to plaintiff a bond for the sale at these respective figures. Efforts were made by plaintiff to secure a purchaser but without avail, plaintiff testifying that he brought four different parties to the mine before bringing Hickey and Lamb. Plaintiff then had a conversation with defendant in which the latter asked the former what he could

do for him "on this mine" and the reply was that he thought his price was too high. Thereupon the defendant fixed the price at thirty-six thousand dollars. Plaintiff had in view Hickey and Lamb as probable purchasers, having, it seems, succeeded in getting Mr. Lamb interested in the property. This was made known to defendant and he executed said contracts of April 21 set out in his answer. Hickey and Lamb came to the mine and in connection with King personally examined and prospected the property, with the knowledge of Reed, it being known to Hickey and Lamb that King had the option for the sale. The contract of sale was prepared and executed by defendant on April 29, and after certain changes were made therein on suggestion of Mr. Hickey, said contract was delivered to King. The price of the property and all the terms of the contract were determined by the parties themselves and King had no discretion whatever in the premises. The whole service performed by him, in brief, consisted in directing the attention of Lamb and Hickey to the mine and in bringing the vendor and vendees together, whereby, through their own negotiations, resulted the sale and purchase of the property. There was not present, therefore, the confidential relation which renders a dual capacity obnoxious to equitable and moral principles.

Indeed, viewing the evidence as the rule requires, we must conclude that there was no taint of fraud or duplicity in the transaction from beginning to end, that no misrepresentations were made and no deceit was practiced by King and that the respective parties to the sale were informed of the fact that King was to receive compensation from the other.

There is, however, one circumstance that might seem at first blush somewhat irreconcilable with the theory of honorable conduct on the part of respondent. This pertains to a letter written by plaintiff to one Richard Russell Smith, on the twentieth day of April, 1907. The letter, though, is rather indicative of the usual broker's "puffing" of property than of downright cunning or dishonesty. It presents also an amusing revelation of the illiteracy and prattling simplicity of the author. Its general tenor may be shown by the concluding portion as follows: "I am not one of Solomans profits or wise men but I know a good thing in gravel when I see it & that mine would be cheap at $50,000.00 but I am going to

do my best to make the old man believe it would be well sold at $30,000. Well you and Mr. Lam will hear from me in a day or to be sure to show Mr. Lam the gold I send that mine is OK.

"Notice I have written this letter so as to get Lam interested so you can just let on as if you dont know whether I wanted you to expose my letter or Not but let him read it just the same; the mine is OK Dick.''

But whatever may be thought of the letter it cannot be regarded as a factor in the case. There is nothing to show that it was ever seen by Lamb or Hickey, nor is there any ground for the inference that King induced Reed to believe that the mine was worth no more than the actual selling price. In fact, no one had better knowledge of the mine than the owner who was anxious to sell and who therefore 'fixed the price at a sum which he and King agreed might be realized.

That Reed was abundantly satisfied with the sale is disclosed by the circumstance that after receiving ten thousand dollars as a part of the purchase price, rather than retain that as a profit together with the mine he brought suit to recover the balance due under the contract. It may be said also that it is declared by respondent and not denied that the mine proved to be valueless.

After a careful examination of the record and of the authorities, we are satisfied that the evidence is sufficient to support the findings, that they support the judgment and that no prejudicial error was committed by the trial court. The judgment and order are therefore affirmed.

Chipman, P. J., and Hart, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on June 1, 1914.